THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FELIX ALBANO, Defendant-Appellant.

First District (4th Division) No. 1—89—0031

Opinion filed June 28, 1991.

McMORROW, J., dissenting.

Williams & Marcus, Ltd., of Chicago (Robert B. Williams and James I. Marcus, of counsel), for appellant.

John O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Michael Brychel, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

After a bench trial, the defendant, Felix Albano, was convicted of delivering controlled substances in violation of section 401 of the Illinois Controlled Substances Act (Ill. Rev. Stat. 1985, ch. 56½, par. 1401). On appeal, the defendant, a licensed medical practitioner, asserts that the State failed to prove beyond a reasonable doubt that when he issued the prescriptions for the controlled substance, Valium, he was not acting in the regular course of medical treatment, as authorized under section 312(h) of the Illinois Controlled Substances Act (Ill. Rev. Stat. 1985, ch. 56½, par. 1312(h)). The defendant also challenges the constitutionality of section 312(h).

The testimony at trial revealed the following facts. Illinois State police agent Mark Padilla testified that on June 19, 1985, posing as a patient, he made the first of four visits to the medical office of defendant Albano. Albano asked Padilla what he could do for him, and Padilla replied that he wanted to receive Valium "to get high." When Albano asked Padilla if he was sick or depressed, Padilla responded that he was not. He told Albano that he used Valium to get high because he had nothing else to do. Albano then informed Padilla that he would give him 10 tablets of Valium and that it would cost him $5. On direct examination, Padilla testified that up to that point in his visit with Albano, Albano had not inquired about Padilla's medical history nor had he conducted any kind of physical examination. On cross-examination, Padilla admitted that he was uncertain about the sequence of the events. He also admitted that Albano had a piece of paper in front of him which he wrote on during his discussion with Padilla. Padilla also admitted on cross-examination that in his police report, written after his visit to Albano, he had stated that the pharmacist was the first person to mention the $5 fee to him and that Albano had informed Padilla that in order to receive the Valium prescription he would have to submit to an examination.

Further discussion between Albano and Padilla ensued. Padilla asked if he could pay for his prescription with his Public Aid card. Albano responded that the payment would have to be on a cash only basis as Public Aid kept a close eye on its records. Albano also told Pa-

dilla not to return for two weeks. Padilla took off his jacket, and Albano took his blood pressure and listened to his heartbeat with a stethoscope. Albano requested a blood and urine sample from Padilla for testing. Padilla refused to comply and told Albano he was afraid of needles. He debated with Albano over the tests, and did not submit to them. Albano did not ask Padilla about his medical history. Albano wrote a prescription for Valium and passed it to the pharmacy connected to the examining room. Padilla's first visit with Albano lasted approximately 10 to 20 minutes, during which Albano was able to clearly observe and hear Padilla. Before he left, Albano informed Padilla that in the future he would be able to receive Valium at a price of $15 for 30 tablets.

After Padilla exited the examination room, the pharmacist gave him a filled prescription for 10 tablets of 10-milligram Valium to be taken one tablet per day. Padilla asked the pharmacist if he could charge the $5 fee to his Public Aid card. The pharmacist informed Padilla that payment had to be in cash.

Padilla's next visit with Albano was less than two weeks later, on June 28, 1985. At that time he spoke with Albano for approximately 5 to 10 minutes. Albano asked Padilla why he had returned so soon. Padilla replied that he used the Valium to get high as it was a long boring summer. Albano told Padilla he was not supposed to have returned for two weeks but that he could have another prescription "this time." Albano told Padilla that he would be charged $15. During the June 28 visit, Albano also asked Padilla a series of questions and made notations on a paper that came from a folder with Padilla's name on it. Albano asked Padilla if he was sick, if he was sleeping all right and if his kids were bothering him. Padilla testified that Albano asked him other questions, but that he did not note these in his police report. Padilla made no medical complaints to Albano. After the June 28 visit, Padilla received a Valium prescription for 30 tablets of 10-milligram Valium, one tablet twice daily. He paid $14.

Approximately 10 days later, on July 8, 1985, Padilla returned to Albano. Albano again asked Padilla why he had returned so soon. Padilla told Albano he wanted to purchase Valium. He also told Albano that he was low on money and wished to charge the Valium to Public Aid. Albano informed Padilla that he could only use Public Aid when he was sick. Albano also asked Padilla other questions he did not note in his police report. Padilla did note in his police report that Albano told him not to return for two weeks. They agreed that Padilla would receive 30 Valium tablets for $15. The visit lasted for approximately five minutes during which Albano made notations on a sheet of paper.

Padilla received the Valium from the pharmacist and paid $15. The prescription dosage was for one tablet daily. Padilla testified that during his consultations with Albano, Albano never gave him instructions about how to use the Valium nor did he warn him of any possible health hazards associated with the drug.

Padilla's fourth and final visit to Albano was 10 days later on July 18, 1985. Albano again asked Padilla a series of questions including what was wrong and other questions Padilla could not recall. Padilla told Albano that he wanted Valium. Albano responded that he knew Padilla needed it, but that he was not supposed to return so soon. Albano told Padilla that he could not come back for one month. In response to Padilla's query about how he could get more Valium within a month, Albano told Padilla that he would have to see other doctors. Before leaving on July 18, Padilla received a refill of 30 Valium tablets, one tablet daily, and paid the pharmacist $15. On each of his last three visits with Albano, Padilla also paid $15 in cash to Albano for the office visit. On the first visit, Padilla paid for the office consultation with his Public Aid card. The payments to the pharmacist were in addition to the amounts Padilla paid for the office visits.

Officer Aguillera testified that he visited Albano on three occasions. On the first visit of July 15, 1985, when Albano asked Aguillera what was wrong, Aguillera either responded that he was okay but that he felt better when he took Valium before going to sleep or that he slept better when he took Valium. Albano asked Aguillera if five milligrams was okay. Aguillera requested 10-milligram tablets but Albano refused. Albano then took Aguillera's blood pressure and pulse, listened to his heart, and asked Aguillera some general health and medical history questions while making notations on a piece of paper. The visit with Albano lasted five to six minutes. Albano wrote a Valium prescription for Aguillera and passed it to the pharmacy. Albano did not advise Aguillera during the consultation about how or when to take the medication. Aguillera received 10 tablets of 5-milligram Valium, to be taken one tablet at bedtime. He paid for the office visit with his Public Aid card and paid $4 in cash for the prescription.

On August 14, 1985, Aguillera returned to Albano's office. On direct examination, Aguillera testified that he asked Albano to increase the quantity of his prescription to 15 tablets and increase the milligram dose to 10 milligrams. On cross-examination, Aguillera admitted that he could not recall whether he had asked for an increased dose of Valium, and there was nothing in his police report to indicate he had done so. Albano took Aguillera's blood pressure and checked his heartbeat, taking notations on a piece of paper. After the August 14

consultation, Aguillera received 15 tablets of 10-milligram Valium and paid the pharmacist $7.50. He paid for the office visit with his Public Aid card.

On September 14, 1985, Aguillera returned to Albano for his third and final visit. He testified that he spent five to six minutes with Albano during which he told Albano that he was fine and that he wanted to increase the quantity of the Valium prescription from 15 to 30. Albano told Aguillera that because of complications, he would have to pay for his visit on a cash basis and that it would cost him $20. Aguillera also requested Tylenol 3 for his wife. Albano issued a prescription to Aguillera for 30 Valium, 10-milligram, and 30 Tylenol 3. On the prescription blank, Albano checked a box that indicated the prescription was issued from Cuneo Hospital. He told Aguillera that he could have the prescription filled at some place other than the clinic's pharmacy. Aguillera did not fill the prescription at the adjoining pharmacy. Aguillera admitted that during the visit there was other conversation; however, he could not recall it in detail, nor could he recall if Albano made any notations during the September 14 visit.

Officer Mary Avent also testified about her visits to Dr. Albano. Avent first went to see Albano on July 9, 1985. Her first visit lasted approximately 15 minutes. Avent stated that when Albano asked her how she felt she responded that she felt fine and was probably as healthy as he was. She told Albano that her sister had received Valium from him and that she wanted some. Albano told her he could write a prescription for only 15 tablets. Albano then asked Avent some medical history questions. Albano requested that Avent take a blood test but she refused, telling Albano she was afraid of needles. Albano persisted, then gave up trying to convince her to have the test. He conducted no physical examination of Avent on her first visit.

During the time she conversed with Albano, Avent saw Albano make notations on a piece of paper. She specifically saw him write the word "diazepam." When Avent asked Albano what the word meant, he responded that it was the technical name for Valium and he was using the word for her protection in the event the police were to find her with the medication. Avent admitted that the only place she saw Albano write the word "diazepam" was on her chart and that she never saw the chart leave Albano's office. Albano wrote a prescription and passed it to the pharmacy. Avent received the 20 10-milligram Valium to be taken once daily from the pharmacist and paid him $10 in cash. Avent paid for the office visit with her Public Aid card.

On July 30, 1985, Avent visited Albano again. According to Avent's direct and cross-examination testimony, she spent from 5 to

25 minutes with Albano on the visit of July 30. Albano asked Avent how she was feeling and referred to other matters she could not recollect. Avent testified that this conversation took place after they had agreed on her prescription, although she admitted that during their conversation, Albano made notations in her file. Albano conducted no physical examination of Avent. On July 30, Avent received 20 10-milligram Valium, one tablet before bedtime, for which she paid $10. She paid no cash to Albano.

Avent's next visit with Albano was on August 14, 1985. Avent asked Albano for a refill of her Valium prescription and a prescription for Tylenol 3. Albano asked her why she needed the Tylenol 3, and Avent asked Albano if she needed to have a reason. When he replied that she did, Avent told Albano that she needed them for headaches, or stomachaches or "whatever." Avent also asked if she could receive a greater quantity of Valium per visit and if she could refill the prescription more frequently than once a month. Albano told her that because of Public Aid's strict policy she could only get a refill once a month with her card. Avent asked whether she could pay for her visits in cash. Albano told her she could, but he would limit her prescriptions to 30 pills. Albano refused Avent's request for more than 30 tablets. Avent's visit with Albano lasted approximately 20 to 25 minutes, during which time they conversed and Albano took Avent's pulse and blood pressure. Albano made notes in Avent's chart. At the conclusion of the visit, Avent received a prescription for 30 tablets of 10-milligram Valium and for Tylenol 3, one tablet every four hours. She paid $32 in cash for the medication and used her Public Aid card to pay for the visit.

Avent's final visit with Albano occurred on September 14, 1985. She spent approximately 5 to 20 minutes with Albano. Avent asked Albano for refills on her Valium and Tylenol prescriptions. She also made a request for a refill for her sister which Albano refused. Avent received a prescription for 30 tablets of 10-milligram Valium, one tablet daily, and 30 Tylenol 3, one tablet every four hours. Avent testified that the instructions for taking the medications were never given to her directly by Albano, but were clearly specified on the pill bottles. Avent paid $31 for the medication. She did not pay cash for the office visit.

Dr. Albano testified that in every case, the prescriptions he issued were prescribed for therapeutic purposes in accordance with applicable medical standards and in the regular course of medical treatment. Albano testified that he diagnosed each of the agent-patients as suffering from anxiety disorder and reflected this on their charts. Albano

further attested that it is not necessary to give a complete physical exam every time Valium is prescribed. Nor are blood and urine tests absolutely necessary before Valium is prescribed. According to Albano's observations, the refusal of Padilla and Avent to submit to urine and blood testing was symptomatic of a medical condition, anxiety or phobia, for which a doctor could properly prescribe Valium. Albano admitted that although he felt the observation significant, he did not note in Padilla's chart his finding that Padilla suffered from a phobia. He also admitted that not every person suffering from a fear of needles needs 10-milligram Valium prescribed for him.

Albano admitted that Padilla told him he wanted Valium to get high and that Padilla denied suffering from any depression or medical ailments. Albano testified that Padilla's words and nervous behavior led Albano on the first visit to conclude that Padilla was suffering from anxiety reaction or anxiety disorder and that the dosage of Valium prescribed for Padilla was well within the proper prescribable range. Albano admitted that he made no notations of Padilla's behavior on his chart other than to note the word "anxiety." He stated that from Padilla's statement that he used Valium to get high, Albano assumed that Padilla was already using Valium, and this assumption figured into his calculation of the proper dosage to administer. Albano admitted he did not put this observation in Padilla's chart and he did not ask Padilla if he was a Valium user. Nor did he note in Padilla's chart, although he considered it significant, that Padilla appeared uncomfortable and uneasy in his chair. Albano asked Padilla to return in two weeks so that he could monitor his symptoms. Albano testified that the fact that Padilla returned before the end of two weeks was evidence of Padilla's uncooperative state of mind, a symptom of anxiety reaction.

Albano was also concerned that Padilla might suffer withdrawal symptoms if the Valium were discontinued. He admitted that he did not diagnose Padilla as a Valium addict on his first visit, although on redirect examination Albano testified that he had concluded Padilla was a Valium addict. Albano testified that the dosage he prescribed for Padilla was not enough to sustain an addiction. He also testified that it would be appropriate in weaning an addict off of Valium to continue prescribing it for a time. Albano testified that he increased Padilla's prescription on the next visit because he thought it was warranted. Albano asserted that he became uneasy with Padilla's failure to follow his directions and told Padilla that he would have to refer him to another physician or psychiatrist, mentioning a specific doctor by name. Albano also testified that it is appropriate under Public Aid

policy to require a patient to pay for office visits if the patient is financially able. He testified that he told Padilla that Public Aid could be used only for major illnesses requiring hospitalization.

Albano testified that he examined Aguillera's head, eyes, ears, nose and throat, finding no abnormalities. He also listened to Aguillera's heart and took his pulse and blood pressure, and checked his lungs. He requested that Aguillera take blood and urine tests and when Aguillera refused, Albano concluded Aguillera had a phobia. He diagnosed Aguillera as suffering from generalized anxiety reaction and sleep disorder. He noted anxiety on Aguillera's medical chart. He prescribed an appropriate amount of Valium. Albano increased Aguillera's Valium prescription on subsequent visits because although Aguillera was improving under Albano's direction, he still needed improvement. Albano admitted that these observations were not made in Aguillera's chart. Nor did he make note of Aguillera's sleep problem, or his refusal to take blood and urine tests, which he considered significant. He also admitted that in response to Aguillera's request for Valium, Albano had asked if five milligrams was okay.

Albano testified that on September 14 when Aguillera requested a prescription for Tylenol 3, he explained that he was suffering on and off from headaches. Albano admitted that 10-milligram Valium was the highest dosage prescribable. He also admitted that when Valium and Tylenol 3 are prescribed together, the combination bears on the proper dosage to administer. He did not ask Aguillera whether he was sensitive to either drug, or about the history of Valium use in his family. Albano admitted that he made no notations about the September 14 visit.

Albano testified that when Avent first came to visit him he noted her hands were clammy, and despite her assertion that she was "fine," he concluded she was anxious. He considered Avent anxious and suffering from lack of sleep. Albano also testified that he felt that Avent's questions regarding what he was writing on her chart showed that she was very anxious. He admitted that he told her that "diazepam" was the technical name for Valium. Albano testified that he again requested a blood test from Avent on her second visit, but that she reacted with fear and refused. He considered her uncooperative and phobic. Albano admitted that he did not note the manifestations of Avent's anxiety in her chart other than to note the word "anxiety," nor did he conduct a physical exam of Avent on either her first or second visit.

Albano testified that on August 14 he gave Avent a full physical examination. He checked her blood pressure, pulse, respiration, heart-

beat, eyes, ears, nose and neck. The fact of these tests is reflected in his notes, but not the results. He prescribed Tylenol 3 in addition to the Valium when Avent complained of headaches. Albano testified that the dosages prescribed were well within the appropriate limits. He admitted that he did not warn Avent of any harm associated with the drugs or inquire whether she suffered from any of the diseases that the Physician's Desk Reference cautions a doctor to consider in prescribing Tylenol 3. Finally, Albano testified that he had no financial interest in the clinic's pharmacy except that the pharmacist rented the space from him for a fixed rent.

Dr. Lahmeyer testified as an expert for the State. Lahmeyer is a licensed physician and board-certified psychiatrist, with concentration in the areas of drug abuse, depression, sleep disorders, and psychiatric problems of medically ill patients. He has served on hospital administrations as the director of inpatient psychiatry and has also administered drug abuse and sleep disorder clinics. Lahmeyer has published articles on depression, drug abuse and sleep disorders. At the time of trial, Lahmeyer was in the employ of the University of Illinois as director of the sleep lab and anxiety clinic. He was also a member of the consult service of the hospital, which advises the medical and surgical staff about the prescription of controlled substances. Lahmeyer has served as the State's expert for the Illinois Department of Registration and Education in cases involving physicians accused of violating medical standards. In criminal cases he has been exclusively a prosecution witness.

Lahmeyer testified that he was familiar with Valium and its use in treatment and that he had prescribed controlled substances as part of his practice. Lahmeyer also stated that he was not an expert on the standards of practice in any area of specialty other than his own, and that general practice, Albano's area of practice, was recognized as a specialty. According to Lahmeyer, where specialties overlap, one specialty will look to the other for the governing standard of care. At trial Lahmeyer was tendered and accepted as an expert in the area of the prescription of controlled substances.

Lahmeyer based his testimony on the transcripts of the police officers' testimony. He assumed the officers' testimony to be true. Lahmeyer testified that a doctor's medical records contain information important to the treatment of a patient. He admitted that Albano's charts contained medical notations. He also testified that for the most part he considered Albano's charts to contain little or no information relevant to diagnosis. Lahmeyer did not assume any of the information in Albano's charts to be true.

Lahmeyer testified that the controlled substance in Valium is diazepam. Lahmeyer stated that Valium is a drug indicated for generalized anxiety disorder and that it is occasionally prescribed for acute anxiety reaction and insomnia. When directed to Albano's notes regarding the three patients, Lahmeyer testified that in each case Albano had noted complaints of anxiety. In Lahmeyer's opinion, however, the information charted was insufficient data from which to form a diagnosis of anxiety. In later testimony, Lahmeyer denied that anxiety was a condition that called for the administration of Valium. He was not allowed to elaborate on this subsequent statement.

In Dr. Lahmeyer's opinion, before prescribing any drug, a doctor should conduct a thorough gathering of a patient's background information, including medical and family history. Lahmeyer testified that physical and mental examinations, and laboratory tests, are also part of the usual procedure a doctor should follow before prescribing any drug. Lahmeyer testified that when Valium is prescribed, a thorough history of the anxiety for which the drug is being prescribed is in order. Such a history includes the physical symptoms, if any, the cause of the anxiety, and the degree or severity of it.

According to Lahmeyer, Tylenol 3 is most commonly used for post-surgical pain, but may also be prescribed on an outpatient basis for those who do not respond to other pain and anti-inflammatory medications. Lahmeyer testified that Valium and Tylenol 3 are commonly prescribed together, although in combination the drugs have a clearly addictive euphoric effect. Lahmeyer considers Tylenol 3 on an outpatient basis to be a drug of last resort.

Lahmeyer testified that, in general, the dosages prescribed by Albano were within the recommended range of the published guidelines of the Physician's Desk Reference. He testified that the Physician's Desk Reference is not a treatment guide but rather a reference regarding drug dosages and side effects. Lahmeyer testified that based on his study of the police reports and transcripts of the testimony of the three police officer patients, Albano's issuance of prescriptions to them for Valium and Tylenol 3 took place outside the ordinary course of medical treatment. According to Lahmeyer, there were no medical conditions indicated; therefore, the drugs prescribed were obviously being used by the patients for something other than a medical condition.

In support of his opinion, Lahmeyer noted that with respect to Agent Padilla, Albano had not solicited any information from the patient that would indicate that Padilla had any medical complaints other than his desire to "get high." Lahmeyer testified that he did

not believe that from Padilla's refusal to take blood and urine tests it could necessarily be inferred that Padilla was suffering from anxiety. Lahmeyer also noted that in failing to note any symptoms of anxiety, Albano ignored the indicators that could have acted as the measure of later improvement or deterioration. Lahmeyer also noted that the prescription Albano issued was for the maximum milligram dosage available, 10 milligrams. Lahmeyer testified that initially prescribing the largest dose of Valium available is inappropriate in treating anxiety.

Lahmeyer also questioned Albano's failure to inquire into Padilla's failure to follow the prescription dosages and Albano's issuance of the prescriptions in the face of Padilla's refusal to submit to blood and urine tests. According to Lahmeyer, Valium can have a toxic effect on patients with kidney or liver problems. Kidney and liver problems would be disclosed through the proper laboratory tests. Lahmeyer also found inappropriate Albano's explanation to Padilla that payment would have to be on a cash basis as Public Aid was to be used only for sickness. In Lahmeyer's opinion, if the patient was not sick, Albano should not have been prescribing Valium for him. Lahmeyer also found suspect the brevity of Albano's visits with Padilla and Albano's admonishment to Padilla that he would have to see another doctor if he wanted a more frequent prescription. Finally, Lahmeyer testified that the amount of Valium prescribed to Padilla was sufficient to maintain a psychological or physical addiction. In Lahmeyer's opinion, the frequency of Padilla's visits to Albano suggested that Padilla was using the drug more frequently than prescribed.

On cross-examination, Lahmeyer admitted that he could cite no medical authority that directly stated that Valium could be prescribed only after a physical examination had been conducted. Lahmeyer also admitted that patients in good physical health can be diagnosed with anxiety. He agreed that Valium may be prescribed without a physical examination. Lahmeyer also stated, that in his opinion, prescribing Valium on a first visit without a physical examination was not within the applicable standard of medical care as supported by general medical education. When shown Albano's medical chart for patient Padilla, Lahmeyer testified that Albano had indicated that Padilla complained that he was anxious all of the time. In Lahmeyer's opinion this in itself would not justify a diagnosis of anxiety. Lahmeyer admitted that Albano could have inferred that Padilla was dependent upon Valium, and that if Padilla was a Valium addict, failure to prescribe Valium could have resulted in tremors and convulsions. Lahmeyer also agreed that there may have been unreported conversation and observation during Albano's visit with Padilla that was significant to a diagnosis,

and that Albano was in the best medical position to evaluate the patient. He also stated that his opinion of Albano's treatment of Padilla did not account for the fact that Albano had requested that Padilla submit to blood and urine tests.

Dr. Lahmeyer also offered the opinion that Albano's treatment of agent-patient Aguillera fell outside the regular course of medical treatment. Lahmeyer noted that Albano agreed to prescribe Valium to Aguillera before inquiring about any symptoms or medical history, or conducting a physical exam. Lahmeyer testified that Aguillera did not specifically indicate any conditions that would call for the use of Valium. Nor did Lahmeyer find any indication of a reason to increase Aguillera's prescription on a subsequent visit. He further noted that it was irregular and unusual for a doctor to combine prescriptions for two different patients onto one prescription blank. Lahmeyer also indicated that prescribing for a related family member is not standard practice unless the doctor is familiar with the related patient. Lahmeyer expressed reservations over the fact that Aguillera appeared to be directing his own treatment with respect to the dosage and number of pills he required. Lahmeyer also found it unusual that the form of payment for the office visits was connected to the number of pills prescribed, and that before an increase in the quantity of the pills was agreed upon, Aguillera stipulated that he would pay for the visit in cash.

On cross-examination, Lahmeyer admitted that the form of payment for the treatment does not speak to the appropriateness of the treatment and that the fees Albano charged were reasonable and customary. He also agreed that from one prescription blank upon which prescriptions for two drugs were written, it could be inferred that the prescription for both drugs was for one person only. Lahmeyer testified that he would spend an hour interviewing a patient with complaints of insomnia. He asserted that the standard he was testifying to was not his own as a psychiatrist, but the standard which he assumed from his training in the area to be that of a general physician. Lahmeyer admitted that he had not practiced general medicine and was not trained in general medicine, and that his training in the area of insomnia exceeded the training of a general physician.

Finally, with respect to agent-patient Avent, Lahmeyer again opined that the prescription Albano provided was offered outside the regular course of medical treatment. Lahmeyer testified that Avent indicated no symptoms that required prescription drug treatment. He also found significant Avent's testimony that Albano told her he was using the word "diazepam" to avoid police detection, and that in or-

der to receive an increase in her prescription she would have to pay cash for office visits. Lahmeyer further pointed out that on Avent's first visit Albano had not conducted a physical exam or inquired into Avent's medical history. Lahmeyer indicated that if he were faced with a patient who refused to submit to laboratory tests, as did Avent, he would not go forward with treatment. Lahmeyer also found unsatisfactory Albano's inquiry into Avent's expressed need for Tylenol 3 and his failure to suggest any other pain reliever as an alternative. Lahmeyer admitted that in refusing to give Avent a prescription for her sister, Albano had acted reasonably. He also testified that there was nothing unusual in itself about a doctor using technical medical language. Lahmeyer further agreed that Tylenol 3 may be prescribed for moderate pain.

The final witness was Dr. Shobris, who testified on behalf of Albano. Shobris is a licensed physician with a specialty in family practice. He has served as chief of staff for Central Community Hospital. He has also been active on the committees and staff of other hospitals. At the time of trial, Shobris was affiliated with Christ Hospital, where he had served as chief of staff and chairman of various committees, including the family practice peer review committee. Shobris was also serving as an associate professor at Rush Medical School. In forming his opinion, Shobris relied on the transcripts of the officers' testimony and Albano's testimony and the police reports and Albano's medical charts.

Shobris testified that in his opinion, all of the prescriptions Albano issued with respect to this case were issued in accordance with proper medical practices. Shobris testified that while different physicians might disagree about the treatment in a particular case, disagreement does not indicate that improper conduct is involved in the chosen treatment. He found the instructions Albano gave in each case to be sufficiently detailed and the dosages to be within the proper range. In Shobris' opinion, none of the drug amounts prescribed were sufficient to maintain an addiction, although the amounts in some cases were sufficient to maintain dependence. In later testimony, Shobris agreed that if a patient were addicted to Valium, a prescription for 30 tablets would be enough to sustain his addiction to a certain degree.

Shobris also testified that the notations Albano made on the charts of the patients indicated treatment in the regular course of medical practice. He considered Albano's notes to be professionally acceptable, although not excellent, and not as detailed as Shobris would have made them. He testified that it is not necessary for Al-

bano to make note of every observation and patient response. He also found that the amount of time taken for each visit, from 5 to 25 minutes, was sufficient. Shobris did not believe there was any impropriety in Albano's fees, the method of payment required, or the fact that Albano discussed payment with his patients.

As for requiring a physical examination before prescribing Valium, Shobris testified that where Valium is used to treat emotional problems in an obviously healthy individual, the main focus of the doctor's examination is to establish the emotional problem. In Shobris' opinion, the question of whether to conduct a physical examination and possibly laboratory tests is a determination for the treating doctor to make. Shobris testified that in some cases testing is cost prohibitive or not possible because of the patient's emotional problems. Shobris also gave examples of some obvious physical symptoms in the absence of which a doctor might determine laboratory tests to be unnecessary. Shobris further testified that in some limited circumstances, a doctor could prescribe Valium or Tylenol 3 over the telephone without conducting a physical examination or seeing the patient first. Shobris also maintained that if a doctor were to continue to use tranquilizers to treat a patient for emotional problems, a physical examination would become necessary at some point.

With respect to Padilla, Shobris indicated that a doctor could reasonably infer from Padilla's statements that he had been taking Valium for some time and was addicted to the drug. If Padilla were addicted to Valium, Shobris considered it appropriate for Albano to have prescribed Valium as a method of weaning Padilla off of the drug. Shobris described the symptoms of Valium withdrawal as potentially very dangerous to a patient's life. After examining Albano's notes and records, Shobris considered the examination Albano conducted on Padilla to be adequate. He testified that a 10- to 20-minute visit was more than enough time for Albano to evaluate Padilla. Shobris also agreed that if Padilla was squirming in his chair, he would be considered restless and anxious. Similarly, he testified that Padilla's refusal to submit to a blood test and his expressed fear of needles signified a phobia for which Valium was an appropriate treatment. Shobris stated that in returning earlier than expected for a prescription refill, Padilla tended to confirm Albano's initial diagnosis that Padilla was suffering from anxiety. Shobris found nothing inappropriate about Albano increasing Padilla's prescription on a subsequent visit, and noted that the dosage was later decreased again.

On cross-examination, Shobris admitted that Albano's notes gave no indication that Padilla was a Valium addict. Shobris also admitted

that squirming in a chair is not unusual behavior for a patient in a doctor's office and that this activity in itself would not warrant a prescription for Valium. He also agreed that refusal to take a blood test does not necessarily manifest a phobia and that even when a patient expresses a fear of needles, Valium is not necessarily indicated. Shobris admitted that once a doctor has determined laboratory tests to be medically significant, he cannot properly diagnose without them. Shobris agreed that according to the notations in Albano's charts, Albano considered the tests to be medically significant.

Shobris testified that Aguillera's complaint that he slept better with Valium was sufficient history from which Albano could prescribe Valium. He also noted that Albano had not agreed to the 10-milligram Valium Aguillera had requested on his initial visit, but had used medical judgment in determining five-milligram Valium to be sufficient. Shobris stated that the fact that Albano prescribed the Valium to be taken at bedtime was further evidence that the drug was prescribed for medical purposes. Shobris also considered it appropriate for Albano to prescribe Tylenol 3 for mild pain, although something more than a mild headache should be indicated. He further testified that it is not uncommon to prescribe Valium and Tylenol 3 together for medical purposes. Shobris testified that he would not have issued a prescription for an absent spouse who was not a patient of his; however, he did not consider Albano's conduct in this regard to be inappropriate, as the amount of codeine in Tylenol 3 can be purchased in some over-the-counter drugs.

On cross-examination, Shobris admitted that the prescription issued to Aguillera for Tylenol 3 was issued on the same blank as the prescription for Valium, and that only one patient's name appeared on the blank. When asked if this procedure indicated bad faith on Albano's part if the Tylenol 3 was in fact issued for an absent spouse, Shobris responded that if it was assumed that Aguillera's version of events was true, Albano's method did show bad faith. He also found objectionable Albano's failure to note Aguillera's last visit on his chart. Shobris agreed that it is inappropriate for a doctor to agree to a prescription for a named drug before evaluating the patient or to indicate that more drugs would be forthcoming before the doctor monitored the patient's progress. Shobris also conceded that if a patient could not use his Public Aid card because he was not sick, then it would follow that no medical treatment would be necessary. He also admitted that it is not within professional standards to issue a prescription, as Albano did for Tylenol 3 and Valium, on Cuneo Hospital letterhead with no instructions as to dosage. Aguillera also testified

with respect to this particular prescription that an oversight by the doctor writing the prescription is not uncommon, and that the error can be corrected by a telephone call from the pharmacist to the doctor.

Shobris testified that Avent's firm refusal to have a physical examination and laboratory tests indicated in and of itself that she had a medical problem. He also noted as anxious behavior Avent's craning to read her medical chart as Albano was writing on it. Shobris admitted that if Albano told Avent he was using the word "diazepam" to circumvent the police, Albano's behavior was unethical.

Albano was convicted under section 401, of the Illinois Controlled Substances Act, for delivery of controlled substances. (Ill. Rev. Stat. 1985, ch. 56½, par. 1401.) In his defense, Albano cited to section 312(h) of the same Act, which authorizes a physician to prescribe or dispense controlled substances when it is done so in "the regular course of professional treatment." (Ill. Rev. Stat. 1985, ch. 56½, par. 1312(h).) On appeal, Albano asserts that the State has failed to satisfy its burden of proving beyond a reasonable doubt that when he prescribed the controlled substances he was acting outside the regular course of professional treatment.

 Section 312 of the Illinois Controlled Substances Act, entitled "Dispensing controlled substances," authorizes a practitioner, in good faith, to dispense controlled substances where to deliver them otherwise would constitute a violation of the Act. Under section 312(h):

> "An order purporting to be a prescription issued to any individual, which is not in the regular course of professional treatment *** and which is intended to provide that individual with controlled substances sufficient to maintain that individual's or any other individual's physical or psychological addiction, habitual or customary use, dependence, or diversion of that controlled substance is not a prescription within the meaning and intent of this Act; and the person issuing it, shall be subject to the penalties provided for violation of the law relating to controlled substances." Ill. Rev. Stat. 1985, ch. 56½, par. 1312(h).

 We do not believe that the prosecution in this case has proved that the defendant beyond a reasonable doubt dispensed controlled substances outside the regular course of professional treatment. The foundation of the prosecution's argument that Albano acted outside the course of regular medical treatment is the testimony of the State's expert witness, Dr. Lahmeyer. Lahmeyer offered numerous credentials to qualify himself as an expert in the area of his specialty, psychiatric medicine, including experience with drug abuse and sleep

disorders. Lahmeyer admitted that he is not an expert in general practice, an area he acknowledged is a recognized specialty, the defendant's specialty. Lahmeyer acknowledged that in asserting the professional standards of Albano's practice, he was, based on his own training in the area, making an assumption.

Furthermore, Lahmeyer essentially admitted that for ailments such as anxiety, sleep dysfunction, and Valium withdrawal, the administration of Valium as a treatment is not unreasonable. Lahmeyer's primary objection was to Albano's method of diagnosis, which in his opinion was an inadequate basis from which to form any medical conclusion. Lahmeyer based his analysis of Albano's methodology only on the testimony of the police witnesses. He considered the information in Albano's charts irrelevant, although he admitted that they contained medical notations. Lahmeyer also admitted that there may have been unrecorded interaction between Albano and the agents that could have a bearing on his evaluation of the appropriateness of the treatment. He agreed that Albano was in the best medical position to judge the significance of the patients' responses and actions.

Lahmeyer faulted Albano for failing to complete what he considered to be comprehensive medical work-ups of the patients, including extensive histories and thorough physical, mental, and laboratory analyses. Lahmeyer could cite no medical authority to support his assertion that a doctor can only prescribe Valium after conducting a physical examination of the patient. He admitted on cross-examination that a physically healthy patient can suffer from anxiety and that there are circumstances when Valium may be prescribed without a physical examination. Further, in assessing Albano's professional behavior, Lahmeyer apparently did not assign any favorable significance to some factors which were uncontested: Albano informed Padilla that he would have to submit to a physical examination before Valium could be prescribed for him and requested he submit to laboratory tests; the prescription given to Aguillera for Valium and Tylenol 3 was issued in the name of one person only; Albano refused to give Avent a prescription for her sister; and the paper upon which Albano wrote the word "diazepam" never left Albano's office.

■ The defendant in the present case is a physician charged with a criminal violation of the Illinois Controlled Substances Act. He has a complete defense to this charge if when he dispensed the controlled substances in question he did so within the regular course of medical treatment. We believe that where a defendant's conviction rests on a finding that he has violated the standards of his profession, he has the right to have the quality of his conduct judged by the standards spe-

cific to his area of practice and not the standards that a specialist from a different practice assumes are proper for the defendant.

■■ ■ Furthermore, there is no significant evidence in this case that the writing of prescriptions for controlled substances was a disproportionate share of Albano's practice. The evidence encompasses a total of 11 visits over a period of three months. Neither the number of prescriptions written, the quantity of the drugs dispensed, nor the fees received from the office visits substantiate a finding that Albano was engaged in a nonmedical endeavor. Both experts agreed that the amount and dosages of the drugs prescribed were within the range allowed according to the Physician's Desk Reference. With respect to the one patient, Padilla, who abused the quantity of Valium he was receiving from Albano, there is uncontroverted testimony that Albano informed Padilla that he would have to see another doctor to receive Valium with more frequency. Albano also refused to give Avent more than the proper dosage allowed in a one-month period. It is also uncontroverted that the agent-patients paid for the majority of their office visits with Public Aid. Further, both experts agreed that the fees Albano charged were not unreasonable.

Moreover, there is uncontroverted evidence that Albano kept charts for each of his patients, in most cases making notations or references to the charts during the office visits. Each of the charts contained a reference to "anxiety," a condition the experts agreed could reasonably call for Valium treatment. Both experts also agreed that "diazepam" is a technical word for Valium. All of the patients at some point received at least some form of physical examination and were questioned about their lifestyle or medical history. There is evidence that some of the office visits were at least 20 minutes in duration. Albano never issued a prescription in a name other than that of his patients. It is uncontroverted that he refused to issue a prescription to Avent for her sister, and that he would not prescribe 10-milligram Valium to Aguillera on his first visit as the agent requested. Nor did Albano make any statements that indicated he thought that the drugs he was prescribing were being used for illegitimate purposes.

■■ For these reasons, viewing the evidence in a light most favorable to the State, we believe that the evidence in this case is so unsatisfactory that it raises a reasonable doubt as to whether at the time he dispensed controlled substances, Albano was not acting within the course of regular medical treatment, and was thus in criminal violation of the Illinois Controlled Substances Act. (See *People v. Chua* (1987), 156 Ill. App. 3d 187, 509 N.E.2d 533.) We are reminded of the testimony of the defendant's expert who stated that because different

doctors might choose different treatment, it cannot necessarily be concluded that the treatment chosen falls below professional standards of practice. While the State may have shown that Albano could have practiced better medicine, we do not believe it has proved beyond a reasonable doubt that his conduct was criminal.

As we have determined the cause on other grounds, it is unnecessary for us to reach the defendant's constitutional argument. (*People v. Chua* (1987), 156 Ill. App. 3d 187, 509 N.E.2d 533.) The ruling of the trial court is reversed.

Reversed.

JOHNSON, J., concurs.

JUSTICE McMORROW, dissenting:

The sole issue addressed by the majority in the instant appeal is whether the State's evidence was sufficient to prove beyond a reasonable doubt that the defendant prescribed Valium outside the scope of regular medical treatment, in violation of section 312(h) of the Illinois Controlled Substances Act. (Ill. Rev. Stat. 1985, ch. 56½, par. 1312(h).) In my view, the State's evidence amply demonstrated that the defendant prescribed Valium outside the course of regular medical treatment, and his conviction should be affirmed. Accordingly, I respectfully dissent.

It is beyond question or debate that the standard of review in all criminal cases, regardless of the nature of the offense or the degree of education or professional standing of the defendant (see *People v. Pintos* (1989), 133 Ill. 2d 286, 549 N.E.2d 344), is whether there was sufficient evidence to prove the defendant guilty beyond a reasonable doubt. Thus, "[i]n reviewing the sufficiency of the evidence to sustain a conviction, the relevant inquiry is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. [Citation.]" *People v. Williams* (1987), 118 Ill. 2d 407, 416, 515 N.E.2d 1230; see also *People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 461.

It is the role of the trier of fact to determine the credibility of witnesses and weigh the strength of the evidence against the accused, and a reviewing court may not encroach upon that function. (*People v. Steidl* (1991), 142 Ill. 2d 204, 226, 568 N.E.2d 837.) The determination of the trier of fact is not to be set aside on review unless it is palpably contrary to the evidence or unless the evidence is so unreasonable,

improbable or unsatisfactory as to cause a reasonable doubt of the defendant's guilt. *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267.

Applying these principles to the case at bar, I conclude that the evidence of record is more than sufficient to sustain the trial court's determination that defendant was guilty of prescribing Valium outside the scope of acceptable medical treatment. The evidence presented shows that Agent Mark Padilla, when he first visited defendant's medical office, requested Valium "to get high" because he had nothing else to do. Defendant asked whether Padilla was sick or depressed, and Padilla responded that he was not. Defendant then agreed to give Padilla a prescription for 10 tablets of Valium. Thereafter, defendant conducted a brief physical examination of Padilla and gave Padilla the Valium prescription. Defendant told Padilla that in the future, Padilla would be able to get a prescription for 30 tablets of Valium for $15. Defendant advised Padilla to return in two weeks.

Less than two weeks later, Padilla returned to defendant's office for another Valium prescription. When defendant asked Padilla why he returned so soon, Padilla replied that he had already used the Valium prescribed by defendant to get high, because it was a long, boring summer. Padilla testified that although he made no medical complaints to defendant, defendant gave Padilla a prescription for 30 tablets of Valium. Defendant told Padilla to return in a month.

Approximately 10 days later, Padilla again returned to defendant's office. Padilla told defendant he wanted to purchase more Valium and charge it to Public Aid. Defendant advised Padilla that he would have to pay cash for the Valium prescription, since Public Aid could only be used if Padilla were sick. Defendant gave Padilla a prescription for 30 Valium tablets, for which Padilla paid $15 in cash.

Finally, 10 days later, Padilla again returned to defendant's medical office and told defendant he wanted more Valium. When defendant informed Padilla he could not come back for a month, Padilla asked defendant how to obtain more Valium within the month. Defendant responded that Padilla would have to see other doctors. Before Padilla left defendant's office on this visit, he received another refill for 30 Valium tablets.

Agent Oscar Aguillera visited defendant three times and received prescriptions for Valium on each of the visits. To obtain the prescriptions, Aguillera told defendant either that he was all right but that he felt better when he took Valium before going to sleep, or that he slept better when he took Valium. At Aguillera's last visit, he told defendant that he was fine but wanted a prescription for 30 Valium tablets,

rather than the 15 Valium tablets previously prescribed, and also asked defendant to prescribe Tylenol 3 for Aguillera's wife. On the prescription blank, defendant prescribed 30 tablets of Valium and 30 tablets of Tylenol 3, and checked a box in the blank indicating that the prescription was issued from the Cuneo Hospital.

Agent Mary Avent testified to four visits with defendant. On her first visit, Avent told defendant that she wanted a Valium prescription. Defendant asked Avent how she felt. Avent answered that she was fine and was probably as healthy as he was. Defendant gave her a prescription for 15 Valium tablets, although he conducted no physical examination of her and she refused to take a blood test. On her next visit, defendant agreed to give Avent a prescription for 20 Valium tablets, and thereafter asked how she was feeling. Two weeks later, Avent returned to defendant's office and requested a refill of her Valium prescription. Avent also asked for a prescription for Tylenol 3. When defendant inquired why she wanted Tylenol 3, Avent asked if she needed a reason. Defendant responded that she did, and Avent told him that she needed the Tylenol 3 for headaches or stomachaches, "or whatever." Defendant then gave Avent a prescription for 30 tablets each of Valium and Tylenol 3. Approximately one month later, Avent returned to defendant's medical office and requested refills on her Valium and Tylenol prescriptions. Defendant complied with her request, but performed no physical examination.

At trial, defendant testified that he prescribed the Valium in each instance because he diagnosed each of the agents as suffering from an anxiety disorder or phobia. He also stated that he noted the word "anxiety" on each of the agents' medical charts. However, defendant further testified that he did not note any manifestations of anxiety in the agents' medical records, although he considered significant some of the agents' anxiety manifestations.

Dr. Lahmeyer, the State's expert witness, testified that defendant's charted information was insufficient data from which an anxiety diagnosis could be made. According to Dr. Lahmeyer, the testimony of the agents failed to indicate that they suffered from a medical condition for which Valium should have been prescribed to the officers. Dr. Lahmeyer testified that defendant's issuance of Valium prescriptions to the agents was not within the ordinary course of medical treatment.

In my view, this evidence was sufficient to prove defendant guilty beyond a reasonable doubt, and his conviction should be affirmed. All of the agents to whom defendant issued Valium prescriptions informed defendant that he or she was in good health and offered no

medical basis for the prescription. The agents testified that the defendant agreed to provide the requested Valium prescription before the defendant performed any physical examination of the agents. Following cursory and pretextual physical examinations of and discussion with the agents, the defendant prescribed the Valium requested by the agents. Return visits by the agents, sometimes before the Valium prescription had expired, also resulted in renewed prescriptions from the defendant without bona fide physical examinations of the agents. Dr. Lahmeyer, the State's expert witness, testified that in his medical opinion, the defendant did not prescribe Valium to the agents in the normal course of acceptable medical treatment.

On this evidence, a rational trier of fact could have readily concluded that defendant's purported physical examinations and notations on medical records and charts were merely performed as a guise or ruse to shield defendant's illegal prescription of Valium outside the scope of reasonable medical treatment. The trier of fact could reasonably have determined that the defendant attempted to circumvent the Act's limitations by performing cursory physical examinations, and by inventing or exaggerating anxiety conditions in the agents, in order to fabricate a factual basis to support his defense. (See, *e.g., Commonwealth v. De La Cruz* (1982), 15 Mass. App. 52, 443 N.E.2d 427 (in criminal proceeding for delivery of controlled substance, physician's claim that patients needed controlled substance because of medical treatment was ruse to disguise doctor's prescription of drugs outside course of regular medical treatment); *cf. Douglass v. Board of Medical Quality Assurance* (1983), 141 Cal. App. 3d 645, 190 Cal. Rptr. 506 (medical disciplinary action appropriate for doctor's wrongful prescription of controlled substance outside acceptable medical treatment, as "evidence *** reveal[ed] a physician quite willing to prescribe dangerous drugs to new patients with only cursory medical examinations").) In my opinion, the evidence of record is not so unreasonable, improbable or unsatisfactory as to raise a reasonable doubt of the defendant's guilt.

The majority disregards the substantial evidence presented by the State which, implicit in its decision, the trial court found credible. The majority not only fails to review the evidence in the light most favorable to the State, but impermissibly views the evidence in the light most favorable to the defendant. In so doing, the majority adopts a result-oriented analysis that distorts the facts of record in order to reverse the defendant's conviction.

Initially, the majority attacks the credibility and weight to be accorded to the State's medical expert, Dr. Lahmeyer. Without citation

to any legal authority, the majority disregards Dr. Lahmeyer's testimony on the reasoning that "where a defendant's conviction rests on a finding that he has violated the standards of his profession, [the defendant] has the right to have the quality of his conduct judged by the standards specific to his area of practice and not the standards that a specialist from a different practice assumes are proper for the defendant." (216 Ill. App. 3d at 264-65.) The majority also observes that Dr. Lahmeyer gave questionable testimony because he did not take into account the records and charts made by the defendant during his treatment of the officers, and because he did not consider certain "uncontroverted" facts of record. 216 Ill. App. 3d at 265.

I cannot concur in the majority's reasoning. Dr. Lahmeyer testified to his qualifications, and the trial court determined that he was qualified to render an expert opinion with respect to whether the defendant prescribed Valium during the regular course of medical treatment. Such a trial court ruling is discretionary and cannot be reversed absent an abuse of that discretion. (See, *e.g., Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322.) The defendant does not claim that the trial court abused its discretion when it recognized Dr. Lahmeyer as qualified to render an expert opinion. Consequently, we must assume, for the purpose of review, that Dr. Lahmeyer was qualified to render an expert opinion at trial with respect to whether the defendant's prescription of Valium occurred in the regular course of medical treatment. In addition, the deficiencies which the majority attributes to the testimony given by the State's witness, an attribution with which I do not agree, would have affected its weight and credibility, which are matters reserved to the trier of fact. The majority improperly redetermines, *de novo* in this appeal, the credibility and weight to be given to Dr. Lahmeyer's testimony, and then erroneously rejects this testimony.

The majority also engages in an impermissible reweighing of other evidence presented in the State's case. (216 Ill. App. 3d at 265.) For example, the majority posits that "there is no significant evidence in this case that the writing of prescriptions for controlled substances was a disproportionate share of Albano's practice." (216 Ill. App. 3d at 265.) However, section 312(h) does not require that illegal prescriptions constitute a "disproportionate share" of defendant's practice. Section 312(h) prohibits even a single prescription of a controlled substance outside the course of regular medical treatment.

The majority also relies upon the amount and dosages of Valium defendant prescribed for the agents, and the defendant's performance of physical examinations of the agents. The majority notes that

defendant "kept charts for each of his patients, in most cases making notations or references to the charts during the office visits. Each of the charts contained a reference to 'anxiety,' a condition the experts agreed could reasonably call for Valium treatment." (216 Ill. App. 3d at 265.) However, none of the agents ever informed defendant that he or she was suffering from anxiety, nervousness, or stress. Defendant's charts failed to note any manifestations of anxiety in any of the agents, even though the defendant testified that some of the anxiety manifestations that he allegedly perceived were significant. Moreover, all of these circumstances recited and relied upon by the majority were considered and rejected by the trier of fact in its determination of defendant's guilt.

The majority's reversal of defendant's conviction in the instant cause selectively emphasizes isolated facts of record that are favorable to the defendant and ignores additional, compelling evidence of defendant's guilt. The majority fails to apply the proper standard of appellate review and impermissibly substitutes its judgment and factual determinations for those properly made by the trier of fact. The majority exceeds the proper bounds of appellate review and usurps the most fundamental function of the trier of fact. Based upon a proper review of the evidence, the record clearly supports defendant's conviction.

The criminalization of a physician's prescription of controlled substances that are not medically necessary to the patient plays an integral role in the concerted, ongoing effort to curb the illicit use and traffic of drugs in this State. Without legislative or case law support, the majority imposes upon the State a higher, more stringent burden of proving that a physician prescribed controlled substances outside the course of acceptable medical treatment. In so doing, the majority undermines the effective prosecution and punishment of physicians who manipulate their medical practice in order to shield their unlawful prescription of controlled substances to those who have no legitimate medical need for the drug.

Because it is not considered by the majority, I do not address the defendant's argument regarding the constitutionality of the statute under which he was convicted. Ill. Rev. Stat. 1985, ch. 56½, par. 1312(h).

For these reasons, I respectfully dissent.